# Hill *et al. versus* Canfield *et al.*

1. Objection to a leading interrogatory under a commission should be made before the commission issues.

2. In trover for lumber, a witness testified that there had been a sudden rise in prices during the season; he might state what was the extent of the rise, and was not confined to the precise time of the conversion.

3. Owners of lumber appointed an agent to sell it; another man told the agent he had authority to sell, and sold it; the agent could not ratify the sale so as to bind his principals.

4. Shoup owned timber; Hill falsely asserting that he had authority from Shoup, sold it to Baum; Shoup afterwards sold to Poor. Poor afterwards, under a belief that Hill had authority, made a settlement with Baum. *Held,* that Poor was not estopped from asserting his title against Baum.

5. A party cannot claim an estoppel arising out of his own or his agent's misrepresentation or fraud.

November 1st and 2d 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Allegheny county:* No. 167, to October and November Term 1868.

This was an action of trover brought to December Term 1865, by G. W. Canfield and J. B. Poor against Jake Hill, Andrew Jackson, Schuyler Jackson, David Jackson, A. F. Baum, and John Carrier. The suit was instituted to recover damages for the conversion of three rafts of timber containing 16,221 feet. The case was once before in the Supreme Court and is reported in 6 P. F. Smith 454. The timber in question had belonged to John Shoup and William Wilkinson, who brought it to Pittsburg in the spring of 1865; they put it into the charge of Thomas Stephens and authorized him to sell it. Jake Hill, one of the defendants,

alleging he had authority from Shoup, one of the owners, sold the timber to Carrier & Baum, two others of the defendants; and about the same time Shoup sold it to the plaintiffs, denying that he had given any authority to Hill to make the sale. Carrier & Baum took possession of the timber, ran it to Cincinnati and sold it.

On the trial, October 6th 1868, before Mellon, J., Stephens testified that Canfield told him he had contracted with Shoup, who was then in Philadelphia, for the timber at 12 cents per foot, and offered to settle with witness for it; witness declined, telling Canfield he might settle with Shoup on his return. Hill afterwards came to witness and told him that Shoup had authorized him (Hill) to sell the lumber at 12 cents; witness told Hill he ought to get 13 cents. While Hill and witness were talking Baum came forward and said he would give 12½ cents; Hill said he could stand 13 cents, and Baum said he would take it. Witness then told Baum to settle with Hill, if he was authorized to sell it he could make it all right as he was responsible. Baum shortly afterwards told witness that Poor was claiming the timber, witness told Baum to go on and settle with Hill. At the time Baum and Hill were dealing, witness told Baum that Poor & Canfield had not bought it.

Shoup testified that he sold the timber to Poor & Canfield and delivered possession on the evening of October 4th 1865; he had left the timber with Stephens before he went to Philadelphia and authorized him to sell it; when witness sold to Poor & Canfield he understood from Stephens that no sale had been made with his consent : Poor & Canfield had paid witness for the lumber when he delivered it to them. The plaintiffs gave other evidence of their possession of the lumber, of the conversion by the defendants, &c. They then offered to read the deposition of Henry Whately taken in Cincinnati under a commission in which the defendants joined by filing cross-interrogatories. The answer to the second interrogatory was objected to at the trial because the interrogatory was leading. No objection had been made before issuing the commission. For this reason the court overruled the objection and permitted the answer to be read, and sealed a bill of exceptions.

Charles H. Prescott was examined for the plaintiff as to the price of timber, and testified that there was a sudden rise in the price in the fall of 1865; witness could not tell whether in October or November. Plaintiff then asked, " What was the extent of the sudden rise of which you speak?" The question was objected to, because no evidence of the rise could be given after October 4th; it should be confined to that time as the date of the alleged conversion. The question was allowed and a bill of exceptions sealed.

[Hill *v.* Canfield.]

The plaintiffs having closed, Stephens was examined for the defendants: When Shoup came back to Pittsburg he asked how it occurred that they had given Poor a note · for 1 cent per foot for his lumber and Shoup one for 12 cents; witness then told Shoup about Hill selling the timber to Baum and saying that Shoup had given him authority. They gave in evidence a receipt as follows :—

" Received, of Shoup & Wilkinson, per Jake Hill, Carrier & Baum's note for $162, at four months, for our interest in three rafts of pine timber, containing 16,221 feet, our interest being 1 cent per foot.

                                        Poor & Canfield.
October 2d 1865."

They also gave evidence that Baum, on the 29th of January 1866, deposited $2108.52, that being the price of lumber as sold by Hill, to meet two notes, one for $162 and the other for $1946.52. There was evidence tending to show that these notes had been given by Carrier & Baum for the lumber, and had been in the possession of Poor, and at Andrew Jackson's request had been given up to him, Jackson.

The plaintiff in rebuttal proved by Shoup that he never gave Hill authority to sell the lumber, and never assented to a sale by Hill; that he told Hill that he would not stand to the sale made by Hill, that Hill then tried to buy it from him, but did not succeed; immediately after the conversation, the two notes were taken up by Jackson, and it was after that Shoup sold the lumber to Poor & Canfield.

The defendants' points were :—

" 1. If the jury believe that Stephens was authorized by Shoup & Wilkinson to sell the timber in controversy; that he knew the terms of sale of the property by Hill to Carrier & Baum; that he assented to or encouraged Baum to close the bargain upon said terms, which terms were agreed to and complied with by Baum & Carrier, and possession taken in accordance with said terms before the alleged sale to the plaintiffs, it interposes a bar to the recovery of the plaintiffs.

2. "If the jury believe that Stephens, the agent of Shoup & Wilkinson, knew of the sale to Carrier & Baum, and assented thereto or encouraged Baum to purchase from Hill, Shoup & Wilkinson would be estopped from contesting the title acquired by such purchase, which estoppel would also apply to the claim of plaintiffs, their vendees, if possession of the timber was taken by Baum & Carrier, before the alleged sale to them.

" 3. Fraud on the part of Hill in making the sale, if such existed, would not affect the rights of Carrier & Baum, unless they knew of such fraud, and of this there is no evidence.

" 4. If Poor, one of the plaintiffs, offered to sell the timber in

[Hill *v.* Canfield.]

controversy to Carrier & Baum, and was afterwards informed of the sale made by Hill, and became a party thereto, by fixing the price to be paid for the interest of himself and Canfield, which was agreed upon, paid to and accepted, the plaintiffs are estopped from asserting any title adverse to that of Carrier & Baum, and cannot recover in this suit.

" 5. If Poor, one of the plaintiffs, offered to sell the timber to Carrier & Baum, and was informed of the sale made by Hill to them, and in view of this, stipulated for the price to be paid for their interest, which was paid to and accepted by said Poor, any title which he and his partner Canfield might afterwards acquire from Shoup & Wilkinson, would be held by them as trustees for Carrier & Baum.

" 6. If there was any conversion of the timber in controversy, it took place at furthest, when Carrier & Baum got possession of the timber, marked it and commenced to raft and use it as their own, and if this occurred on or before the 3d of October, A. D. 1865, the plaintiffs cannot recover in this action.

" 7. If Carrier & Baum delivered to the plaintiffs their note, as the consideration for their *interest in the* timber, there can be no recovery against them until the plaintiffs return or offer to return said note ; and the offer to give said note, or the actual giving of it to Andrew Jackson, is not sufficient, without proof, that he was then the agent of Carrier & Baum, and of this there is no evidence.

8. " There being no evidence in aggravation of damages affecting Carrier & Baum, the plaintffs can in no event recover more than the market price of the timber at Pittsburg, at the time it was taken, with interest from the time of the conversion until the present time."

The court answered as follows :—

" 1 & 2. These points are answered in the affirmative, with this explanation or qualification in regard to the alleged assent or encouragement by Stephens, viz. : If such alleged assent or encouragement is predicated of the evidence to the effect that Hill alleged to Baum and Stephens that *he* was *authorized* to sell the lumber, and thereupon, Stephens, on that account, supposing himself to be superseded, declined to take any part in the sale, but informed Baum that Hill was responsible for what he did, and afterwards gave it *as his opinion*, when interrogated by Baum, that he supposed that Shoup & Wilkinson had not themselves, up to that time, made any sale to Poor & Canfield. This, we instruct you, would not, on Stephens' part, if he was ignorant of want of authority in Hill, amount to any such assent or encouragement as would divest Shoup & Wilkinson's title, and transfer it to Baum & Carrier, or constitute a valid sale of property. His assenting to Hill's acting as agent for Shoup & Wilkinson, upon Hill's assertion that

[Hill *v.* Canfield.]

he had authority so to act, could neither constitute nor ratify a sale by Hill, in which Stephens declined to take part, and his information to Baum, when inquired of afterwards, that, in his opinion, Shoup & Wilkinson had not made any prior sale, when it was true that no prior sale had been made, and his statement that Hill was a responsible party for his acts, could not be construed as such encouragement as would prejudice Shoup & Wilkinson's title, but was rather calculated to put Baum on his guard as to Hill's authority to sell.

" 3d Point. We cannot instruct in accordance with this proposition. Fraud on the part of Hill, in making the sale, might affect the right of Baum & Carrier, if such fraud as is alleged here did exist, and of this we cannot say there is no evidence. The fraud alleged is that Hill pretended, both to Stephens and Baum, that he was authorized to sell the timber, when, in truth and in fact, he had no authority at all so to do. If this is true, Hill's sale to Carrier & Baum conferred no title to the property, and the timber could be demanded and recovered of them by the rightful owners. Unless Hill had power from the owners, or their agent, to sell, his professed power and sale under it, would be a fraud, and, unless ratified afterwards by Shoup & Wilkinson, or their authorized agent, with full knowledge of the facts, it would confer no title on Baum & Carrier.

" 4th Point. This proposition is true, and is affirmed; but I would say this, in regard to it, if Poor was not deceived by Hill's assertion of authority, or the implied assertion, by reason of same, and made the settlement referred to, with knowledge of Hill's defective or doubtful power to sell, and of Carrier & Baum's doubtful, or disputed title, under it—in other words, with a knowledge of all the facts and circumstances in regard to it, and made the adjustment of his and Canfield's interest therein with such knowledge, the plaintiffs would be estopped, as herein asserted; but if Poor made this settlement and adjustment of his claim, under the impression induced by Hill, or Baum & Carrier, that it was an actual bonâ fide sale to Carrier & Baum, or to Hill himself, when, in fact, it was only a pretended or void sale, then the transaction referred to in this point would not have the effect to estop Poor & Canfield from subsequently purchasing of Shoup & Wilkinson, when they discovered they had been deceived.

" 5th Point. Our answer to the 4th point will equally apply to this. The title by them subsequently acquired, would not enure to Carrier & Baum's benefit, if the settlement and adjustment of his claim was predicated of the representation and belief that Carrier & Baum had actually purchased the property from an authorized agent, when, in fact, their alleged purchase was void. On the other hand, if, as aforesaid, he made the settlement and adjusted his interest in the property with a knowledge

13 P. F. Smith—6

[Hill *v.* Canfield.]

of the actual facts and circumstances in regard to Baum & Carrier's alleged purchase, or in regard to their defective title, he would·be held as a trustee for their use, under his subsequent purchase.

" 6th Point. We answer this point in the negative. Taking possession of the property, without removing it, may or may not be a conversion, under the circumstances. There may be a joint possession, and possession without conversion, and even work done on it, without conversion. The conversion of property is when the party takes exclusive possession, and converts it to his own uses and purposes, or withholds it from the owner; and this is a question of fact, which I refer to you, under the evidence. If such conversion by Baum & Carrier took place before sale to, and possession by Poor, as alleged, about the 4th of October, the plaintiffs here cannot recover.

" 7th Point. This point we answer in the negative. It assumes facts. The evidence is for you, but our recollection is, that the notes were not merely offered to, but received and taken away by Jackson and Hill, both the note previously given in settlement of Canfield & Poor's interest, and the note to Shoup & Wilkinson, or for their interest; and we do not recollect any evidence of Poor's agency to receive the note for Shoup & Wilkinson, nor that it·had been endorsed by them, or if they were not payees, and whether the payee had endorsed, or any evidence of Poor & Canfield's or Shoup & Wilkinson's acceptance of this note, of the larger amount, and how, and for what purpose it was left in that place, although seen at their place, and taken away, according to the testimony of McClure, by Jackson and Hill.

" 8th Point. If there is no evidence in the case of aggravation, affecting Carrier & Baum, this point is correct; but whether there is such evidence, under all the testimony, we leave to you. The theory of the defence, in regard to it, is, that Carrier & Baum were bonâ fide purchasers, through Hill, without knowledge of his defective authority, and that the other parties defendants are, besides Hill, the mere employees of Carrier & Baum, for rafting and running their timber. If this is the correct theory of the case, in this respect, then the defendants' proposition is correct, and the damages are to be ascertained and assessed as therein stated, if the verdict is for the plaintiffs. But the plaintiffs' theory of the case is different, and, according to it, they allege that there is evidence of aggravation, affecting Carrier & Baum, in this, that they were aware, or had reason to be informed, of Hill's want of power to sell to them; that the question of his power was the subject of discussion between them and Stephens, and that when their employee and agent, Andrew Jackson, was informed by Shoup, in the presence of Hill, that Shoup & Wilkinson had neither made nor authorized any such sale, Hill admitted

[Hill *v.* Canfield.]

this, but said he had authority from somebody else, and Jackson, thereupon, declared he would take the timber, whether or no, and the timber was taken accordingly.   All this, and other circumstances of evidence in the case, the plaintiffs allege, manifest a common interest in the defendants, or couple Carrier & Baum with the transaction, which was intended to get the property out of the possession of its rightful owners, by pretence of purchase, at the point of time when Carrier & Baum were buying up all the timber in the market, with a view to enhance the market price. This is the theory of the plaintiffs, in regard to this part of the case, and which theory is correct, is entirely a question for you to determine.    But if you find, from the evidence in the case, that it (the plaintiffs') is true, and the plaintiffs, on the other grounds in the case, are entitled to a verdict, they are entitled, if, in your opinion, the justice of the case demands it, to a higher measure of damages than that which is indicated in this point of the defendants.

"The common and ordinary rule for the assessment of damages in actions of trover, is the market price of the article at the time and place of its taking and conversion to the defendants' use, with interest thereon to the date of the verdict; but in cases where the property has been taken, or procured from the rightful owner through fraud or force, or trickery and deception, to benefit the party taking and converting it, at a time or under circumstances which deprived the owner from just gains, which he otherwise would reasonably have made by its retention; in such case the rightful owner is entitled, not only to the ordinary market value, at the time and place of its taking and conversion, but also to such additional damages as the jury may believe necessary to make him whole, and put him in as good condition as he would have been in had his property remained unmolested.   Whether this is a case of that kind, is for you, under all the evidence.

"[Hill, if not the agent of the owners in the transaction, must have been the agent of the purchasers, from or through him.   A broker is mutual agent of the seller and buyer, where authorized to sell, and, in consequence, Baum & Carrier would be visited with the consequences of his acts;] and as no distinction can be made in the verdict, as between the defendants, the same verdict must, if against them, whatever it may be, be rendered as against all of them whom you may find to have actively participated in the transaction of the taking and conversion of the timber, and if some of them are more to blame than others, they must settle that between themselves.

"And in case you find for the plaintiffs, and find no such evidence of aggravation as would justify more than compensatory damages against defendants, and the testimony of market price is conflicting, the jury should be satisfied, at all events, that they

[Hill *v.* Canfield.]

allowed plaintiffs what was the full market price at the time of the conversion, with its interest. Where one party puts it out of the power of another to deal with his own property as he pleases, and to make the most of it, he cannot complain at being made to pay as much for it as may be reasonably supposed could have been made out of it at the time and place where the conversion took place." * * *

The verdict was for the plaintiffs for $3586.19.

On the removal of the case to the Supreme Court by the defendants, they assigned for error: the rulings as to the evidence; the answers to the points; the instructions as to damages, and the part of the charge in brackets.

*W. P. Jenks* and *B. F. Lucas* (with whom were *A. G. Lucas* and *A. M. Brown*), for plaintiffs in error.—The 73d Rule of the Court of Common Pleas requires exceptions to a deposition to be filed after the return of the commission; it is not required to make objection when the interrogatories were filed. The acts of Stephens were the acts of Shoup & Wilkinson, and his principals were bound by them: McKelvy *v.* Truby, 4 W. & S. 323; Carr *v.* Wallace, 7 Watts 394. As to damages they referred to Hill *v.* Canfield, 6 P. F. Smith 454.

*D. Barclay* and *C. B. M. Smith* (with whom were *Collier, Miller & McBride*), for defendants in error.—The possession at the time of conversion was properly left to the jury: Harger *v.* McMains, 4 Watts 418. The right of possession is sufficient: Mather *v.* Trinity Church, 3 S. & R. 512; Fleming *v.* Bevan, 2 Barr 408; Jacoby *v.* Laussatt, 6 S. & R. 305.

The opinion of the court was delivered, November 22d 1869, by

THOMPSON, C. J.—The first specification of error in this case is to the admission in evidence against objection, of the second interrogatory put by the plaintiffs below to Whately, a witness examined on a commission, and his answer thereto. The objection was that the interrogatory was leading, and that, therefore, the answer ought not to be received. The court overruled the objection, holding that an objection to the character of the interrogatory should have been made by the defendants before the commission issued. This was a good reason for the ruling, especially as the defendants joined in the commission by filing cross-interrogatories. This has been often held; but I need only cite Overton *v.* Tracey, 14 S. & R. 311, which is at hand, as sufficient authority on the point. The 73d rule of court is not applicable to the point—that refers to objections to depositions taken, and perhaps to the execution of commissions. This error, we think, is not sustained.

[Hill *v.* Canfield.]

Nor do we think that the second exception below is any better founded. The witness Prescott had spoken of a rise in the price of timber in the autumn of 1865, the same season in which the controversy arose. Having so stated the fact in a general way, the plaintiff's counsel proposed to ask him, "what was the extent of the sudden rise in the price of timber of which you speak?" It seems to me this was proper to be asked, if what he had said was testimony, and it was not objected to, in order to give definiteness to what he had already said. Whether it would have any applicability to, or effect in the case, eventually, would depend on subsequent testimony. The court could not reject it at that stage of the case. There was no error, therefore, in receiving it. If the only ground of controversy had been the amount of damages which the plaintiffs were entitled to receive there would have been more plausibility in the objection at that point of the controversy, although not more of soundness; but the defence was that no damage, was to be recovered at all—that they were not liable to any. Hence it seemed somewhat inconsistent to object that such testimony might subject them to too high a rate of damages, while denying liability to any. At all events, the question was properly allowed, and the answer to be given.

There are twelve other assignments of error. These are upon the answers of the court to the points submitted by the defendants' counsel, and to portions of the general charge. We see nothing in any of them that looks like error, or requires much discussion.

The 3d, 4th and 5th assignments relate to the effect of an alleged assent of Stephens, the agent of Shoup & Wilkinson, to a sale of the timber in controversy, by Hill, one of the defendants, to Carrier & Baum. There was certainly abundance of testimony to go to the jury tending to show that if any assent of Stephens was given to a sale of the timber by Hill it was under the belief that Hill had authority from Shoup & Wilkinson to make the sale, superinduced thereto by the declarations of Hill that he had such authority. It was contended by the plaintiffs below that if any assent were given by Stephens, or acquiescence in the sale by him, it was thus induced. If this were so, such an assent, so induced, would not bind the owners, or anybody. If he was simply the agent in the business of Shoup & Wilkinson, to sell the timber, he could not delegate his power so as to bind them, even if he had attempted it. *Delegatus non delegare potest.* The answers, and body of instructions on this point of the case, were proper, and as favorable to the defendants as they had any right to expect. It was referred to the jury to say whether Stephens had assented to the sale by Hill, without being misled by him as to his authority to so sell, with the instruction, if such were the case, the plaintiffs could not recover; but if he was misled, and there was no authority in Hill to make the sale, they might.

[Hill *v.* Canfield.]

This is the substance of the instructions, and they certainly were as favorable to the defendants as they could reasonably claim to have them.

The sixth assignment also is not sustained. It is to the answer of the court to the third point of the defendants below. It is certainly true, as was in substance said by the learned judge, that if Hill, through fraud, and without authority, made sale of the timber to Carrier & Baum, no title passed, and did not prevent the owners from selling it to other parties. To hold the contrary would be to assent to the doctrine of market overt, although not applicable to our times, and more, for Hill had not even the possession of the property he was selling.

The answer to the defendants' fourth point was also unobjectionable. It was to the effect that if Poor, on behalf of Canfield and himself, was not deceived by Hill's claim of a right to sell the property, and became a party in selling out their alleged interest in it to Carrier & Baum, they might be estopped from holding for themselves under a purchase from Shoup & Wilkinson. But if he made a settlement of their interest in the belief that Hill had authority, while, in fact, he had none, his contract to secure himself and his partner in the timber or lien upon it, would, under such circumstances, not estop them in asserting title as against Carrier & Baum, under a bonâ fide purchase from the owners. The defendants cannot be allowed to claim an estoppel arising out of the misrepresentations or fraud of their agent or their own. This is a principle too consonant with justice to need a reference to authorities to prove. The instructions, therefore, on this point were altogether right and proper, and the submission of these positions to the jury was right.

These remarks are applicable also to the answer of the court to the defendants' 5th point, which involves the same principle as that contained in the 4th point, and this disposes of the 8th and 9th assignments of error.

In regard to the answer of the court to the defendants' 6th point, which is the matter of the 10th assignment of error, we think the assignment is not sustained. At what time, place, and in what circumstances, conversion of the timber took place was a question solely for the jury, and this was the direction of the court on the subject, and was right.

The 11th, 12th and 13th errors are not substantially assigned in accordance with the rules, and we need not discuss them *in extenso*, but in truth this is of little consequence in the case, for we have examined them and find no error in the answers of the court of which they are predicated.

The 14th and last assignment of error is to the remark of the learned judge in his general charge, that " Hill, if not the agent of the owners of the timber in the transaction, must have been

[Hill v. Canfield.]

the agent of the purchasers from, or through him.   A broker is the mutual agent of the seller and buyer, when authorized to sell, and in consequence, Baum & Carrier would be visited with the consequences of his acts.''   We see not wherein injury could have resulted to the defendants from the remark quoted.   The defendants claimed through a sale made by Hill, not through a sale by Shoup.   Nothing like that, we think, appeared in the case, and there was enough in the case to enable a jury to draw the inference, at least there was enough to be submitted to the jury to draw the inference, that Carrier & Baum became the purchasers through the agency of Hill.   If so, and he had no authority to sell to them, they would take no title, and they could not escape responsibility for converting the property to their own use to which they had no right.   The true import of the remark and its purpose, was to assert that if Hill had no authority in the premises, the defendants' purchase from him would be no protection to them, and that they would be responsible for the property to the plaintiffs if they were invested with the title.   This was right beyond a question.   We see no necessity or call for any more elaboration of this case than we have given it, although the assignments of error are numerous and the discussion of the several questions assumed a very wide range.   Therefore, seeing no error in the various rulings of the learned judge, we are brought to the conclusion that the judgment must be affirmed.

Judgment affirmed.