CITY OF PHILADELPHIA, Trustee
Under The Will Of Stephen Girard,
Deceased, Acting By The Board Of
The Directors Of City Trust, Plaintiff,

v.

ONE READING CENTER ASSO-
CIATES and MSI Associates,
L.P., Defendants,

and

Alaska Permanent Fund Corporation,
Intervenor/Defendant.

No. CIV.A. 00–5149.

United States District Court,
E.D. Pennsylvania.

June 8, 2001.

Paul R. Fitzmaurice, Pelino & Lentz A. Professional Corporation, Philadelphia, PA, for plaintiff.

Edward I. Swichar, Mark L. Rhoades, Blank Rome Comisky & McCauley LLP, Philadelphia, PA, for One Reading Center Associates and MSI Associates, L.P.

Mary Catherine Roper, Drinker Biddle & Reath LLP, Philadelphia, PA, for alaska Permanent Fund.

### MEMORANDUM

DuBOIS, District Judge.

## I. INTRODUCTION

This case arises out of conflicting agreements regarding the sale of the Aramark Tower, a Philadelphia, Pennsylvania landmark. Defendants MSI Associates ("MSI") and One Reading Center Associates ("One Reading"), are partnerships

that were formed for the express purpose of owning and maintaining the Aramark Tower; they own the property and leasehold, respectively. Intervenor defendant Alaska Permanent Fund Corporation ("Alaska") is a limited and general partner of the MSI and One Reading partnerships (referred to collectively as the "partnerships" or "Seller").

Alaska claims that it had a right of election to purchase the partnership interests of its partners MSI and One Reading in the Aramark Tower upon receipt of a bona fide offer from a third party for the building. Plaintiff City of Philadelphia, Trustee Under the Will of Stephen Girard, Deceased, Acting by the Board of the Directors of City Trust ("the Board," "Girard Estate" or "Purchaser") made such an offer by entering into an agreement of sale with the Seller dated August 4, 2000. In response, Alaska attempted to exercise its alleged right of election. This action followed.

Plaintiff seeks a preliminary injunction ordering Seller to specifically perform its obligations under the agreement of sale between Seller and Purchaser discussed *infra* and proceed with the sale of the building to plaintiff. Alaska argues that the Court should deny plaintiff's motion in its entirety or, at this preliminary stage, enjoin the sale to Alaska pending a full trial on the merits. For the following reasons, plaintiff's Motion for Preliminary Injunctive Relief will be granted in part and denied in part. The sale to Alaska will be enjoined; the remaining relief sought in the Motion for Preliminary Injunctive Relief will be denied without prejudice.

## II. PROCEDURAL HISTORY

Plaintiff filed a Verified Complaint in the Philadelphia County Court of Common Pleas on October 10, 2000 against MSI and One Reading. Those defendants removed the action to this Court on October 11, 2000 pursuant to 28 U.S.C. § 1441. Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunctive Relief in this Court on October 12, 2000. By Order dated October 13, 2000, this Court granted Alaska's oral motion to intervene as a party defendant, and, by agreement of the parties, ordered settlement on the purchase of the building postponed until the Court decided the Motion for Preliminary Injunctive Relief. Plaintiff's Motion for a Temporary Restraining Order was denied without prejudice in view of that agreement.

The parties filed a Joint Motion for Entry of Confidentiality Order Pursuant to Federal Rule of Civil Procedure 26(c)(7) on November 13, 2000. On November 16, 2000, defendants One Reading and MSI and intervenor defendant Alaska filed Motions for Summary Judgment; plaintiff filed a Memorandum in Opposition to the Motions for Summary Judgment on November 22, 2000. The Court held a hearing on plaintiff's Motion for Preliminary Injunctive Relief on November 30, 2000. Intervenor defendant Alaska then filed a Motion for Leave to Amend Answer to Assert Additional Affirmative Defense on December 8, 2000. On December 12, 2000, the Court held oral argument on plaintiff's Motion for Preliminary Injunctive Relief, the motion presently before the Court.

## III. APPLICABLE LAW

Because of the complex nature of the relationship between the parties in this case and the contracts at issue, the laws of three jurisdictions are implicated. The two defendant partnerships, MSI Associates and One Reading Center Associates, were formed under the laws of Delaware and Pennsylvania, respectively. Accord-

ingly, the law of those jurisdictions shall be applied to all partnership issues.

With respect to the contracts at issue in this case—an Agreement and Consent ("Consent") and an Agreement of Purchase and Sale ("Sale Agreement")—the Court will give deference to the parties' choices of law as embodied in those agreements. The Consent expressly provides that it "shall be governed by the laws of the State of Illinois without regard to conflicts of laws rules." Consent ¶ 8. The Sale Agreement also contains a choice of law clause—it is to be governed by the laws of the Commonwealth of Pennsylvania. Sale Agreement ¶ 18.4.

"Both Pennsylvania law and the Restatement of Conflict of Laws provide that the first question to be answered in addressing a potential conflict of laws dispute is whether the parties explicitly or implicitly have chosen the relevant law." *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir.1999). If the parties have agreed to the applicable law, "[c]hoice of law provisions in contracts will generally be given effect." *Smith v. Commonwealth Nat'l Bank*, 384 Pa.Super. 65, 68, 557 A.2d 775, 777 (Pa.Super.1989). As the parties in this case have offered no reason why their contractual choices should not be given effect, this Court will respect the parties' choices and construe the Consent in accordance with Illinois law and the Sale Agreement under Pennsylvania law. In addition, the Court will evaluate agency issues pertaining to the Sale Agreement under Pennsylvania law.

## IV. STANDARD FOR INJUNCTIVE RELIEF

Preliminary injunctive relief is appropriate where "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir.1998) (citing *Merchant & Evans, Inc. v. Roosevelt Bldg. Prods. Co., Inc.*, 963 F.2d 628, 632–33 (3d Cir.1992)). *See also Wright v. Columbia University*, 520 F.Supp. 789, 792–93 (E.D.Pa.1981) ("To prevail on its motion for a temporary restraining order and a preliminary injunction, plaintiff must demonstrate that irreparable injury will occur if the relief is not granted until a final adjudication on the merits can be made, that there is a reasonable probability of success on the merits, and that the possibility of harm to the non-moving party will be minimal and that harm to the public, when relevant, will not be likely.").

Under Federal Rule of Civil Procedure 65, "the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application" for a preliminary injunction. Fed. R.Civ.P. 65(a)(2). In this case, the parties could not reach agreement on this issue and advised the Court that some discovery would be required before scheduling a trial on the merits. Accordingly, in this Memorandum, the Court only analyzes issues pertinent to plaintiff's Motion for Preliminary Injunctive Relief. In addressing those issues, the Court will analyze the applicable law and determine whether plaintiff established the elements necessary for the issuance of a preliminary injunction, focusing on likelihood of success on the merits and irreparable harm.

## V. DISCUSSION

### A. Factual Background

On November 17, 1999, the Telephone Real Estate Equity Trust ("TREET"), Heitman Real Estate Fund II ("HREF")

and Alaska,[1] entered into the Consent relating to the marketing and potential sale of the Aramark Tower, a building owned and maintained by the partnerships they had previously created—MSI and One Reading. The Consent granted Alaska an election to purchase the partnership interests [2] of the remaining partners of Seller—TREET and HREF—upon receipt of a bona fide third-party offer for the purchase of the Aramark Tower. The Consent further provided that the partners would cause their partnerships, MSI and One Reading, to market the property according to the terms of the Consent and that Heitman Capital Management LLC ("Heitman") would prepare a form purchase agreement to be used by prospective purchasers. Under the terms of the Consent, Heitman was required to give written notice to Alaska

> of the existence of a Qualified Third–Party Offer that TREET and HREF, have approved, which notice (the "Offer Notice") *must* include a copy of the Qualified Third Party Offer and clearly state that each of TREET and HREF has approved the Qualified Third–Party Offer. . . . For purposes of this Agreement, "Qualified Third–Party Offer" means an offer to purchase the Property that is in a form satisfactory to Heitman

... that is sufficient to constitute a "Bona Fide Offer" within the meanings of section 6 of the Partnership Agreements. . . .

Consent ¶ 3(a) (Ex. P–16). The Consent does not contain a provision specifying the time by which Heitman must notify Alaska of the existence of an offer. It provides, however, that Alaska has an election to purchase interests in the partnerships as follows: "Alaska may elect by written notice to Heitman at any time within ten (10) business days following its receipt of such Offer Notice, to purchase all Partnership Interests of TREET and HREF ... except that in calculating the purchase price there shall be a 1% reduction from the purchase price" as stated in the offer. Consent ¶ 4(a) (Ex. P–16).

After marketing the property, MSI and One Reading, through their agent Heitman, entered into a Sale Agreement dated August 4, 2000 with plaintiff, Girard Estate. In describing Alaska's right of first refusal, the Sale Agreement recited that a partner of Seller "has the right to match the offer to purchase the Property and Leasehold made by Purchaser to Seller as contemplated herein. . . ." Sale Agreement ¶ 3.5, at 9 (Ex. P–5).

1. The Alaska Permanent Fund has a general partnership interest of .313873% and a limited partnership interest of 31.073427% in the two partnerships involved in this case—One Reading Center Associates and MSI Associates, L.P. Agreement for Acquisition of Partnership Interests at 4 (Ex. P–14) (agreement relating to One Reading Center Associates, a partnership created under the laws of Pennsylvania); Agreement for Acquisition of Partnership Interests at 4 (Ex. P–15) (agreement relating to MSI Associates, L.P., a partnership created under the laws of Delaware).

TREET and HREF formed ORCA–MPT, Inc. and ORCA–HREF, Inc., respectively, to own their interests in the Aramark Tower. Consent, Recitals ¶ A. TREET, through

ORCA–MPT, Inc., has a general partnership interest of .376648% and a limited partnership interest of 37.288152% in the partnerships. HREF, through ORCA–HREF, Inc., has a general partnership interest of .309479% and a limited partnership interest of 30.638421%. Agreement for Acquisition of Partnership Interests at 4 (Ex. P–14); Agreement for Acquisition of Partnership Interests at 4 (Ex. P–15).

2. As used in the Consent, " 'Partnership Interests' means the partnership interests which the parties hereto own, directly or indirectly, in The Partnerships." Agreement and Consent ¶ 1 (Ex. P–16). "The Partnerships" means One Reading and MSI. *Id.*

Upon execution of the Sale Agreement with plaintiff, Heitman provided Alaska with notice of the Board's offer and a copy of the Sale Agreement as required by paragraph 3(a) of the Consent by letter sent via United Parcel Service ("UPS") on August 4, 2000. Stipulated Facts ¶ 23. UPS delivered the Sale Agreement to Alaska on August 9, 2000. Stipulated Facts ¶ 24. Thereafter, by facsimile sent August 22, 2000, Alaska purported to exercise its right of election to purchase its partners' partnership interests as set forth in paragraph 4(a) of the Consent. *See* Ex. P–6 (facsimile letter from Peter M. Naoroz to Thomas D. McCarthy and Howard J. Edelman). Heitman then informed Girard Estate, by letter dated August 23, 2000, that "Seller has received a notice from the Right of First Refusal Party timely exercising the Right of First Refusal." Ex. P–6 (letter from Howard J. Edelman to the Girard Estate).

Plaintiff contends that defendants MSI and One Reading breached the Sale Agreement by accepting an offer from Alaska that does not match the offer for the Aramark Tower submitted by the Board. Specifically, plaintiff contends that Alaska's offer is materially different in that it does not match plaintiff's offer and that because Alaska's offer did not match the offer made by the Board, the right of first refusal was not timely exercised. Due to this alleged breach, plaintiff argues that the Court should order defendants to sell the Aramark Tower to plaintiff in accordance with the Sale Agreement.

In response, Alaska contends that its offer does match plaintiff's offer and that its rights in the property established by the Consent, a prior contract, are superior to the Board's claim under the Sale Agreement for the Aramark Tower. Alaska also argues that if the right of first refusal as described in the Sale Agreement and the

right of election clause set forth in the Consent are inconsistent, the inconsistent provisions in the Sale Agreement are invalid—that Heitman had no authority to enter into an agreement that modified Alaska's rights and that any unwritten modifications to the Consent are void under the statute of frauds. Alaska further contends that the Court should not order the sale to plaintiff at this preliminary stage.

The Court first addresses the question whether the offer to purchase the Aramark Tower made by Alaska matches the offer made by the Board. Second, the Court turns to the question whether the partnerships are bound by the Sale Agreement that was executed by their agent, Heitman. Third, the Court analyzes plaintiff's argument that defendants and Alaska should be equitably estopped from denying the representations contained in the Sale Agreement. Fourth, the Court will evaluate whether Alaska, by approving the Sale Agreement, modified the Consent. Finally, the Court discusses defendants' argument that Girard Estate did not timely notify the partnerships of its intention to seek specific performance as required by the Sale Agreement.

### B. Did Alaska's offer match that of the Purchaser?

■ The Court first turns to the question of whether Alaska's offer matched the offer to purchase the Aramark Tower made by the Board. At the preliminary injunction hearing, plaintiff presented evidence that the representations in the Sale Agreement regarding the right of first refusal and the right of election set forth in the Consent and subsequent offer by Alaska do not match.

The Sale Agreement with Girard Estate provides as follows:

*Right of First Refusal.* Seller represents to Purchaser (i) that a partner of Seller (the "Right of First Refusal Party") *has the right to match the offer to purchase the Property and Leasehold made by Purchaser to Seller as contemplated herein* ("Right of First Refusal"), and (ii) that said Right of First Refusal may be exercised by the Right of First Refusal Party at any time within ten (10) business days after it receives a copy of this Agreement. Seller will deliver a copy of this Agreement to the Right of First Refusal Party within two (2) business days after this Agreement has been fully executed by both parties. As a condition to Seller's obligation to consummate the transaction contemplated under this Agreement, either (x) the period during which the Right of First Refusal may be exercised by the Right of First Refusal Party shall have expired, with no such exercise having taken place, or (y) the Right of First Refusal period shall have been effectively waived, or, pursuant to the terms of the Right of First Refusal, is deemed waived, by the Right of First Refusal Party. If the Right of First Refusal is exercised by the Right of First Refusal Party within the period during which the Right of First Refusal may be exercised, Seller shall immediately notify Purchaser, this Agreement shall terminate, any Earnest Money deposited by Purchaser shall be returned to Purchaser and neither party shall have any further rights or liabilities hereunder except for the Surviving Obligations and except as set forth in the following sentence. . . .

Sale Agreement ¶ 3.5, at 9 (Ex. P–5) (emphasis added).

However, as discussed *supra*, the Consent provides Alaska a right to elect to purchase the partnership interests of TREET and HREF, its partners in the MSI and One Reading partnerships, upon receipt of a bona fide third-party offer for the Aramark Tower, calculating the purchase price at a one percent reduction from the purchase price stated in the third party offer. In the Consent, Alaska's right of election is described as follows:

> In the event that Alaska receives an Offer Notice on or before the deadline set forth in Section 3 therefor . . ., Alaska may elect by written notice to Heitman at any time within ten (10) business days following its receipt of such Offer Notice, to purchase all Partnership Interests of TREET and HREF, as if the Qualified Third–Party Offer contained in the Offer Notice had been presented by TREET or HREF, as a Bona Fide Offer pursuant to Section 6 of each of the Partnership Agreements, and Alaska was the sole Offeree electing to purchase the interest of the Submitting Partner under Section 6 of each of the Partnership Agreements, except that in calculating the purchase price there shall be a 1% reduction from the purchase price stated in the Qualified Third Party Offer. . . .

Consent ¶ 4(a) (Ex. P–16).

Plaintiff argues that Alaska's election to purchase partnership interests pursuant to the Consent constitutes an offer that is materially different from the Board's offer to purchase the Aramark Tower. Thus, plaintiff contends that Seller breached the Sale Agreement by attempting to accept Alaska's offer to purchase partnership interests.

As an initial matter, the Court notes that contract construction is a question for the Court in the absence of ambiguity. "'[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone.'" *Capek v. Devito,* 767 A.2d 1047, 1050 (Pa.2001) (quoting *Commonwealth of Pennsylvania,*

*Dep't of Transp. v. Manor Mines, Inc.*, 523 Pa. 112, 565 A.2d 428, 432 (1989)) (modification in original); *see also Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 153 (3d Cir.2001) (concluding that, under Illinois law, a contract's express provisions govern in the absence of ambiguity); Restatement (Second) of Contracts § 212 (1981) ("[A] question of interpretation of an integrated agreement is to be determined as a matter of law."). In this case, the terms of the offers contained in both the Sale Agreement and Consent are clear and unambiguous, the Court thus construes the question of whether the offers match as a matter of law.

The Court concludes that Alaska's offer to purchase partnership interests pursuant to its right of election does not match the offer to purchase the property made by plaintiff. In the first place, the right of election exercised by Alaska provides for the purchase of all partnership interests of MSI and One Reading, not the building. Second, the Consent provides for a one percent reduction of the contract price set forth in the Sale Agreement, a reduction of $792,250 dollars in the contract price. Lastly, in addition to a higher price, plaintiff agreed to pay transfer taxes of 4% on the property, amounting to $379,905. Stipulated Facts ¶ 21 (Ex. P–41). However, by virtue of the fact that Alaska's right of election provided for the purchase of partnership interests, not the building itself, Alaska would most likely not be responsible for any transfer taxes as the partnerships already owned the property and leasehold. *See* Ex. P–31 (e-mail message from Joseph Neverauskas of Heitman to Alaska).[3]

In light of the Court's conclusion that Alaska's offer to purchase partnership interests pursuant to the Consent does not match the Board's offer to purchase the Aramark Tower, the Court turns to Alaska's related contention that the right of first refusal provision in the Sale Agreement is a mere representation and that a misrepresentation does not entitle plaintiff to the extraordinary remedy of specific performance. As discussed *supra*, the Sale Agreement states that "a partner of Seller (the 'Right of First Refusal Party') has the right to match the offer to purchase the Property and Leasehold made by Purchaser to Seller as contemplated herein.…" Sale Agreement ¶ 3.5. Defendant argues that even if this representation is untrue, plaintiff is not entitled to specific performance.

 The Court agrees with Alaska that the matching language of paragraph 3.5 of the Sale Agreement is a representation. The Court disagrees with Alaska's contention that because the matching language is a representation, plaintiff is, as a matter of law, not entitled to specific performance. *See, e.g., Williams v. Kerr*, 152 Pa. 560, 25 A. 618 (1893) (granting the specific remedy of reconveyance where owners of land were induced to sell it by a false representation); *see generally Zettlemoyer v. Bloch*, 329 Pa. 205, 198 A. 80 (1938). Furthermore, insofar as the representation contained in paragraph 3.5 is considered part of Seller's obligation to perform, accepting an offer that does not match could be considered a breach of the Sale Agreement.

In addition, the Sale Agreement specifically provides that Purchaser may seek

---

**3.** By e-mail message dated June 12, 2000, Joseph Neverauskas of Heitman Capital Management wrote that "[i]f Alaska purchases the partnership, it appears that transfer taxes would be avoided. The reason is that they are part of the current ownership. A new buyer which is a none related [sic] entity would be liable for the transfer tax." Ex. P–31.

specific performance "in the event that Seller shall fail to consummate this Agreement...." Sale Agreement ¶ 17(a)(i). The trier of fact could conclude that defendants failed to consummate the sale by accepting an offer from Alaska that did not match plaintiff's offer, and that plaintiff is entitled to specific performance.

Having concluded both that Alaska's offer to purchase partnership interests did not match Alaska's offer to purchase the Aramark Tower and that a trier of fact could conclude that plaintiff is entitled to specific performance because Seller improperly failed to consummate the Sale Agreement, the Court must next analyze whether Heitman had the authority to enter into the Sale Agreement and whether the partnerships are bound by Heitman's actions and/or representations.

## C. Did Heitman have the authority to enter into the sale agreement?

It is well settled that an agent has the power to make contracts which will bind the principal "if the agent has actual or apparent authority." *Residential Reroofers Local 30–B Health and Welfare Fund of Phila. and Vicinity v. A & B Metal and Roofing, Inc.*, 976 F.Supp. 341, 345 (E.D.Pa.1997) (citations omitted). *See* 15 Pa. Cons.Stat.Ann. § 8321;[4] 6 Del. C. § 15–301.[5] "Actual authority" is the authority a principal expressly grants to an agent, *Residential Reroofers* at 345, while "'[a]pparent authority exists where the principal, by words or conduct, leads people with whom the alleged agent deals to believe that the principal has granted the agent the authority he purports to exercise.'" *Id.* (quoting *Richardson v. John F. Kennedy Mem'l Hosp.*, 838 F.Supp. 979, 985 (E.D.Pa.1993) (emphasis omitted)). *See generally* Williston on Contracts § 35:11 at 201 (4th ed. 1999) ("An agent has the power to make contracts which will bind his principal not only when actually authorized to do so by express words or inference of fact, but also in cases where the principal did not intend to confer such authority on the agent, but, nevertheless, held out to the public or to the person with whom the agent dealt an appearance of authority."). Furthermore, an act of a partner "not apparently for the carrying on of the business of the partnership in the usual way" may bind the partnership when that act is authorized by the other partners. 15 Pa. Cons.Stat.Ann. § 8321(b); 6 Del. C. § 15–301.

In this case, plaintiff argues that Alaska and the partnerships are bound by the Sale Agreement as Heitman, in negotiating and executing the Sale Agreement, was acting as the partnerships' agent. In support of this proposition, plaintiff points to

---

**4.** 15 Pa. Cons.Stat.Ann. § 8321(a) provides as follows:

Every partner is an agent of the partnership for the purpose of its business and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership unless the partner so acting has in fact no authority to act for the partnership in the particular matter and the person with whom he is dealing has knowledge of the fact that he has no such authority.

**5.** 6 Del. C. § 15–301(a) provides as follows:

Each partner is an agent of the partnership for the purpose of its business, purposes or activities. An act of a partner, including the execution of an instrument in the partnership name, for apparently carrying on in the ordinary course the partnership's business, purposes or activities or business, purposes or activities of the kind carried on by the partnership binds the partnership, unless the partner had no authority to act for the partnership in the particular matter and the person with whom the partner was dealing had notice that the partner lacked authority.

specific language of the Consent, which provides that "Heitman, in consultation with TREET, HREF, and Alaska, will prepare a form of purchase agreement to be used by prospective purchasers in making offers to acquire the property." Consent ¶ 2(a) (Ex. P–15). The Consent further provides that Heitman will give Alaska notice of a "Qualified Third–Party Offer" for the Aramark Tower, defining a "Qualified Third–Party Offer" as "an offer to purchase the Property that is in a form satisfactory to Heitman (although Heitman will endeavor in the negotiation of the [sale] contract to cause the purchaser to enter into a contract similar to the form of purchase agreement described in Section 2)" of the Consent. Consent ¶ 3(a) (Ex. P–15). In response, Alaska contends that, to the extent its rights are modified by the Sale Agreement, Heitman's actions were not authorized.

There is evidence that the partnerships expressly authorized Heitman to market the Aramark Tower and prepare a form purchase agreement, which the partners approved. *See* Consent ¶ 2(a) (Ex. P–15). In that agreement, the Seller represented to potential purchasers that (1) the Seller has the legal power, right and authority to enter into this Agreement (Sale Agreement ¶ 6.1); (2) no consent of any partner, shareholder, member, creditor, investor, judicial or administrative body, authority or other party is required which has not

been obtained to permit the partnerships to enter into the Sale Agreement (*id.* ¶ 6.2); and (3) "[n]one of the execution and delivery of [the Sale] Agreement and documents referenced herein, the incurrence of the obligations set forth herein, the consummation of the transactions herein contemplated or referenced herein conflicts with or results in the material breach of any terms, conditions or provisions of or constitutes a default under, any bond, note, or other evidence of indebtedness or any contract, lease or other agreements or instruments to which the Seller is a party." *Id.* ¶ 6.5.

Accordingly, under traditional agency principles, a trier of fact could conclude that the partnership expressly authorized Heitman to enter into the Sale Agreement, or that Heitman acted with apparent authority, making the agreement binding on all of the partners in the partnerships. However, Alaska argues that some of the representations contained in the Sale Agreement were untrue and that Heitman did not have the authority to execute a Sale Agreement that modified its rights as set forth in the Consent.[6] As a result, it is Alaska's position that Heitman's actions do not bind Alaska to the extent the Sale Agreement modifies Alaska's rights under the Consent. The Court now turns to that argument, first examining whether the partnerships are bound by actions and rep-

---

**6.** Pursuant to the Consent, Alaska held a right to elect to purchase the partnership interests at a one percent discount from the purchase price of the property upon the receipt of a qualified third-party offer. Alaska asserts that authorization of the Sale Agreement would have modified the Consent so as "(1) to constrict the time Alaska had to exercise its Right of First Refusal; (2) to restrict the manner in which Alaska could give notice of its election; (3) to require Alaska to offer to pay more for the Property than was required under the Agreement and Consent; and possibly (4) to require Alaska to engage in a futile purchase

of fee title in which it would pay itself for the portion of the Property that it already owned, and incur liability for transfer taxes that it would not have had to pay under the Agreement and Consent." Alaska Permanent Fund Corporation's Post–Hearing Br. at 12. The argument that Heitman was not authorized to modify Alaska's rights in these ways does not directly refute evidence that the partnerships approved or ratified its agents actions or that Alaska approved an action by the partnerships, and, as a result, it is bound by the action taken or estopped from repudiating it. *See* discussion Parts V(C) & V(D), *infra.*

resentations that may have been beyond the scope of Heitman's express authority. The Court will then analyze whether the partnerships approved or ratified Heitman's actions and/or representations.

### 1. Is the partnership bound by the Sale Agreement if Heitman's actions and/or representations were beyond the scope of its express authority?

■ Assuming *arguendo* that Heitman's actions were beyond the scope of the express authority conferred by the partnerships, the Court nevertheless concludes that material issues of fact remain with respect to whether the partnerships are bound by the representations in the Sale Agreement. As an initial matter, the Court determines that principals are bound by the unauthorized representations made by their agents under certain circumstances:

> Except as to statements with relation to the agent's authority, in actions brought upon a contract or to rescind a contract, a disclosed or partially disclosed principal is responsible for unauthorized representations of the agent made incidental to it, if the contract is otherwise authorized and if true representations as to the same matter are within the authority or the apparent authority of the agent, unless the other party thereto has notice that the representations are untrue or unauthorized.

Restatement (Second) of Agency § 162 (1958). *See American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir.1994) (observing that a principal may be held liable for an agent's misrepresentations upon matters that the principal might reasonably expect would be the subject of representations, provided that the third party had no notice that the representations were unauthorized) (citing

*Sanders v. Rowan*, 61 Md.App. 40, 484 A.2d 1023, 1029 (1984)); *Aiello v. Ed Saxe Real Estate, Inc.*, 508 Pa. 553, 559, 499 A.2d 282, 285 (1985) (holding that principal may be liable to third parties for, *inter alia*, the misrepresentations of its agent even where unauthorized, on public policy grounds, i.e., "that it is more reasonable that when one of two innocent persons must suffer from the wrongful act of a third person, that the principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger"); *see also Alterman v. Lydick*, 241 F.2d 50, 53 (7th Cir.1957) (concluding, under Illinois law, that "[a]lthough an agent may exceed his actual or implied authority, there is no doubt that he may bind his principal by the commission of acts which fall within the ambit of his apparent authority").

■ Furthermore, although it is true that "[a] principal may limit the authority of his agent in any manner he chooses ... [,] such limitations upon the agent's authority or any special or secret instructions to the agent ... must be communicated to the party with whom the agent deals, or the principal will be liable to the same extent as though they had not been given." Williston on Contracts § 35:19 at 249 (4th ed. 1999). As explained by the Superior Court of Pennsylvania, " 'secret instructions' have no effect upon dealings with a third person who has no notice of them." *Zager v. Gubernick*, 205 Pa.Super. 168, 171, 208 A.2d 45, 48 (Pa.Super.1965).

Plaintiff argues that, given the undisputed evidence that the Board had no knowledge of the terms of the Consent, the partnership cannot avoid responsibility for its agent's representations regardless of whether these representations were authorized. On that issue, plaintiff has presented evidence that Heitman made misrepresentations to the Board regarding

the nature of Alaska's right of first refusal—it stated that the right of first refusal party, Alaska, had the right to match the offer of the Purchaser, and the Court has concluded that Alaska's offer made pursuant to its right of election as set forth in the Consent did not match the offer made by the Board. However, given that the Sale Agreement was otherwise authorized and that the making of representations as to the nature of Alaska's right of election were within the scope of Heitman's express authority and foreseeable, the Court determines that a trier of fact could conclude that the representations made by Heitman in the Sale Agreement are binding on the partnerships.

Having determined that the trier of fact could conclude that Alaska and the other partners are bound by the representations made by Heitman regardless of whether the representations were within Heitman's express authority, the Court turns to the question whether Alaska is bound by the Sale Agreement as a result of approving or ratifying Heitman's actions and/or representations.

### 2. Did the partnerships approve or ratify Heitman's actions and/or representations?

■ Even if the trier of fact were to conclude that Heitman acted in the absence of valid authority, there is evidence to suggest that the partners, including Alaska, approved or ratified Heitman's action. In this case, the Sale Agreement was submitted to Alaska and there is no evidence that Alaska objected to its terms. Plaintiff argues that there is evidence to suggest that Alaska approved of and accepted the terms of the Sale Agreement on two occasions. First, Leif Ormseth of Heller Ehrman White & McAuliffe, counsel for Alaska, reviewed and approved the form sale agreement prepared by Heitman

before it was executed by Girard Estate (*see* Ex. P–23; Stipulated Facts ¶ 15 (Ex. P–41)). In addition, Alaska did not object to the terms of the Sale Agreement upon receiving notice of the Board's offer and a copy of the Sale Agreement from Heitman on August 9, 2000.

As a general rule, a partnership may be bound by an unauthorized act of an agent where the principal ratifies or fails to repudiate the agent's unauthorized act. *See United States v. One 1973 Rolls Royce*, 43 F.3d 794, 818 n. 26 (3d Cir.1994) ("The concept of ratification in agency law, for example, allows a principal to be bound by an agent's unauthorized prior act if the principal knows about it and fails to take affirmative steps to disavow the act.") (citing Restatement (Second) of Agency § 83 (1958)); *Hirzel Funeral Homes v. Equitable Trust Co.*, 46 Del. 334, 83 A.2d 700 (Del.Super.Ct.1951) ("A contract made by an agent for his principal either wholly without authority or in excess of his authority may, of course, be ratified by the principal and once ratified becomes as binding as if originally made by him."); *Balph v. Liberty Nat'l Bank*, 179 Pa. 430, 36 A. 337 (1897) (holding that a principal may be bound upon ratifying an agent's act); *see generally* Bromberg and Ribstein on Partnership § 4.03(d)(2) at 4:66 ("Ratification requires an 'affirmance' of an earlier unauthorized act by partners who would have had the authority to bind the partnership in the first instance. An affirmance includes any conduct manifesting consent to be bound by the transaction.").

However, an agent may not ratify the unauthorized action of another agent. *Hill v. Canfield*, 63 Pa. 77 (1869), *available at* 1869 WL 7674. As a result, plaintiff's argument that a ratification of Heitman's actions occurred when Leif Ormseth of Heller Ehrman White & McAuliffe, counsel for Alaska, reviewed the Sale Agree-

ment, may ultimately fail in the absence of evidence that he had been authorized to approve Heitman's actions and/or representations. *See, e.g., Chelsea Nat'l Bank v. Lincoln Plaza Towers Assocs.,* 61 N.Y.2d 817, 473 N.Y.S.2d 953, 462 N.E.2d 130 (1984) (concluding that partnership was not bound to a loan guarantee where an attorney for the partnership who was also assistant secretary of the corporate general partner had no express or apparent authority).

Finally, an affirmance of an unauthorized action may be inferred from a failure to repudiate it. *See SEI Corp. v. Norton & Co.,* 631 F.Supp. 497, 503 (E.D.Pa.1986); Restatement (Second) of Agency § 94 (1958). In light of evidence that Alaska reviewed the Sale Agreement, the Court concludes that the trier of fact could find that Alaska approved or ratified it and Heitman's actions and/or representations. The Court next turns to a related argument—the argument that Alaska should be equitably estopped from denying the representations contained in the Sale Agreement.

**D. Equitable Estoppel**

█ Under Pennsylvania law, "[e]quitable estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *Northwestern Nat'l Bank v. Commonwealth,* 345 Pa. 192, 196, 27 A.2d 20, 23 (1942). The essential elements of an equitable estoppel claim are as follows:

(1) that the party against whom the doctrine is sought to be asserted intentionally or negligently misrepresented a ma-

terial fact, knowing or with reason to know that the other party would justifiably rely on the misrepresentation, (2) that the other party acted to his or her detriment by justifiably relying on the misrepresentation, and (3) that there was no duty of inquiry on the party seeking to assert estoppel.

*Homart Dev. Co. v. Sgrenci,* 443 Pa.Super. 538, 554, 662 A.2d 1092, 1099–1100 (Pa.Super.1995). *See generally* Bromberg and Ribstein on Partnership § 4.03(d)(3) ("A partner's act may bind the partnership by estoppel even in the absence of authority or ratification, and even without conduct by the partners manifesting consent to be bound, when the partners carelessly permit a third party to rely to its detriment on the acting partner's assertion of authority.").

█ In this case, plaintiff presented evidence at the preliminary injunction hearing that tended to show that the partnerships intentionally concealed the details of Alaska's right of election because they believed that revealing the terms to prospective purchasers would not "have been the smart thing to do." Hearing Tr. at 151 (testimony of Howard J. Edelman, Nov. 30, 2000). Plaintiff also presented evidence at the hearing that the Board relied on the partnerships' representations that the right of first refusal described in the Sale Agreement was "standard" (*id.* at 11 (testimony of Richard Burcik, Nov. 30, 2000)) and that the Board inquired about the right of first refusal.

With respect to the first element of the equitable estoppel claim, Richard Burcik, the general manager of Girard Estate, asked about the right of first refusal and was told that it was a standard right of first refusal, which, by his understanding, meant "that the party that holds that right has the right to match the material conditions of the offer that I might make." *Id.*

However, the trier of fact could easily conclude that the right of first refusal to which the Sale Agreement referred was not "standard" because it provided for a one percent discount and a purchase of the interests of the remaining partners in the two partnerships as opposed to a purchase of the building itself.

Moreover; contrary to what was set forth in the Sale Agreement, Alaska's right of election was not "the right to match the offer to purchase the Property and Leasehold made by Purchaser [plaintiff] to Seller [the partnerships]." Sale Agreement ¶ 3.5, at 9 (Ex. P–5). In light of the evidence, the trier of fact could find that defendants misrepresented the nature of Alaska's right of election in order to mislead a prospective purchaser. In addition, as discussed *supra*, Seller made specific representations in the Sale Agreement itself, which, plaintiff argues, the partners are now estopped from denying. In Section Six of the Sale Agreement, Seller represents, warrants, and covenants that (1) the Seller has the legal power, right and authority to enter into this Agreement (Sale Agreement ¶ 6.1); (2) no consent of any partner, shareholder, member, creditor, investor, judicial or administrative body, authority or other party is required which has not been obtained to permit the partnerships to enter into the Sale Agreement (*id.* ¶ 6.2); and (3) the execution and delivery of the Sale Agreement does not conflict with or result in a material breach of any other agreement to which Seller is a party. *Id.* ¶ 6.5. Such evidence satisfies the first element of a claim for equitable estoppel.

With respect to the second prong of an equitable estoppel claim—the requirement that the party seeking estoppel acted to its detriment by justifiably relying on the other party's misrepresentation—there is evidence that the Board relied on the language of the Sale Agreement, which provided that a partner of the Seller has the right to "match the offer to purchase the Property and Leasehold made by Purchaser to Seller as contemplated herein" (Sale Agreement ¶ 3.5). The Board was required to put forth substantial earnest money (*see* Sale Agreement ¶ 2.2(a)); it has also expended resources on due diligence and legal fees.

Finally, with respect to the third prong—that there was no duty of inquiry on the party seeking to assert the estoppel—the trier of fact could conclude that the Board met its duty of inquiry with respect to the nature of the right of first refusal, to the extent that such a duty of inquiry existed. As discussed *supra*, plaintiff presented evidence that Richard Burcik, the general manager of Girard Estate, sought further information regarding the right of first refusal clause and was misled into believing that it was a standard right of first refusal whereby the right of first refusal party would be required to match the Board's offer for the Aramark Tower.

Having determined that the finder of fact could conclude that defendants are estopped from denying Alaska's approval of the Sale Agreement and the representations contained therein, the Court now turns to the question whether Alaska modified the Consent by its approval of the Sale Agreement.

### E. Modification of the Consent

A determination that Alaska authorized Heitman's actions or subsequently ratified the Sale Agreement by failing to repudiate it would require a trier of fact to conclude that Alaska accepted a modification of its rights as set forth in the Consent, as the right of election set forth in the Consent does not match the representations concerning the right of first refusal contained

in the Sale Agreement. *See supra* Part V(B); *supra* note 6. Defendant argues that Alaska did not approve any such modification or intend to modify the Consent and that such a modification would be void under the statute of frauds. Accordingly, the Court will next examine the validity of an unwritten modification of the Consent under the statute of frauds. The Court will then analyze the question whether Alaska approved or authorized the Sale Agreement, and, if it did, whether the Consent was modified by such approval or authorization.

### 1. Does Illinois law require a writing to modify the Consent?

■ As discussed *supra* Part III, the Consent provides that it shall be construed in accordance with Illinois law. In Illinois, as a general rule, a "partner may not bind the partnership to [a contract for the conveyance of real property] 'unless authorized by the other partners.'" *Inland Real Estate Corp. v. Christoph,* 107 Ill. App.3d 183, 63 Ill.Dec. 9, 437 N.E.2d 658 (1st Dist.1981) (quoting Section 9(2) of the Uniform Limited Partnership Act, codified at 805 Ill.Comp.Stat. 20⅝ (West)). The partnership laws of both Pennsylvania and Delaware include similar restrictions on partners' authority. *See* 15 Pa. Cons.Stat. Ann. § 8321(b) ("An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners."); 6 Del. C. § 15–301(b) ("An act of a partner which is not apparently for carrying on in the

ordinary course the partnership's business, purposes or activities or business, purposes or activities of the kind carried on by the partnership binds the partnership only if the act was authorized by the other partners.").

■ The Sale Agreement is a contract for the sale of land; the Consent is a contract for the sale of all partnership interests. Both contracts thus involve subject matter beyond the scope of ordinary partnership business. However, in Illinois, authorization for a partner to act outside the ordinary course of business need not be in writing.[7] *See Murray v. Korshak,* 52 Ill.App.2d 119, 127, 201 N.E.2d 737, 741 (1st Dist.1964). Moreover, Illinois law does not require express written authorization to convey partnership property—the statute of frauds is satisfied by the partnership certificate. *See Inland Real Estate Corp. v. Christoph,* 107 Ill.App.3d 183, 63 Ill.Dec. 9, 437 N.E.2d 658 (1st Dist.1981).[8] Since the question of whether the Consent could be validly modified without a writing is governed by Illinois law and Illinois law does not require written authorization for a partner to act, the Court concludes that a modification of the Consent by Alaska could be made without a writing.

### 2. Modification

■ It is a well established law of contracts that "[a] valid modification must meet all the criteria essential for a valid contract: offer, acceptance, and consider-

---

7. However, as discussed *supra,* the partnerships authorized Heitman in the written Consent to enter into a contract for the sale of the Aramark Tower.

8. As mentioned *supra* Part III, the MSI and One Reading partnerships were not formed under Illinois law, but under the laws of Delaware and Pennsylvania, respectively. The

central inquiry here, however, does not implicate the partnership laws of these jurisdictions. Rather, the Court need decide the very narrow question of whether an unwritten modification of a contract outside the usual scope of partnership business is ever enforceable under Illinois law. The Court concludes it is.

ation." *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198 (7th Cir.1985). As discussed *supra* Parts V(C)(2) and V(D), there is evidence in this case that the Sale Agreement was submitted to Alaska on two occasions and that Alaska did not disapprove the Sale Agreement at those times.[9]

Alaska argues, as a matter of law, that there was no valid consideration for what it characterizes as a substantial change in its rights as set forth in the Consent and that it did not intend to modify the Consent.[10] On the issue of consideration, the sale price is substantial consideration for Seller—the Sale Agreement sets the price for the Aramark Tower at $79,225,000 [11] (Sale Agreement ¶ 2.2, at 3). Since Alaska, as a partner of Seller, would be entitled to a share of the proceeds if the Sale Agreement were to be consummated, the Court determines that a trier of fact could conclude that any modification to the Consent is supported by consideration. Additionally, if the Sale Agreement was authorized by all of the sellers, Alaska as a partner, would be bound by its terms, including those that modified its right of election as set forth in the Consent. *See* 59A Am.Jur.2d Partnership § 1329 (1987) ("Even a sale by a partner outside the usual course of partnership business, which has in some manner been authorized by the partners, binds the partnership ....").

Further, as argued by plaintiff, the evidence of approval of the Sale Agreement, if believed by a finder of fact, is sufficient to modify the terms of Alaska's right of election. Under these circumstances, the Court concludes that a finder of fact could determine that all of the essential elements of a valid contract modification are present—i.e., that there was an offer, acceptance and consideration for the modification of the Consent.

**F. Was plaintiff's notice of its intention to seek specific performance timely?**

■ The Court now turns to defendant's argument that plaintiff's notice of its intention to seek specific performance was untimely. In interpreting contractual notice of claim provisions, the Pennsylvania Supreme Court has recognized the general principle that "courts should not presume to interfere with the freedom of private contracts ...." *Brakeman v. Potomac Ins. Co.*, 472 Pa. 66, 371 A.2d 193 (1977). However, there is an exception to this general rule where one party's interference with the other's ability to comply with the notice provision has occurred. *See Allied Fire & Safety Equip. Co., Inc. v. Dick Enters., Inc.*, 972 F.Supp. 922, 929–

---

**9.** The Court notes, as set forth *supra* Part V(C)(2), that submission of the Sale Agreement to Leif Ormseth may not have been sufficient to constitute ratification or approval of the contract.

**10.** Under Illinois law, "[w]hen construing a contract, [the Court's] duty is to effectuate the intent of the parties to the contract." *In re Nitz*, 317 Ill.App.3d 119, 124, 250 Ill.Dec. 632, 739 N.E.2d 93 (2d Dist.2000); *North Shore Gas Co. v. Salomon Inc.*, 152 F.3d 642, 652 (7th Cir.1998) ("Illinois law requires the court to give effect to the parties' intent at the time the agreement was made.") (citing

*LaSalle Nat'l Trust v. ECM Motor Co.*, 76 F.3d at 140, 144 (7th Cir.1996)). With respect to the issue of contract modification in this case, the Court cannot construe the intent of the parties as a matter of law. The Court thus determines that questions concerning Alaska's intention to modify the Consent must be resolved at trial.

**11.** The total purchase price comprises the price payable to the fee owner of the property ($9,497,644) and the price payable to the leasehold owner ($69,727,356). Stipulated Facts ¶ 20 (Ex. P–41).

30 (E.D.Pa.1997) ("*Allied*") (denying summary judgment where there was a factual dispute as to whether a party failed to comply with contractual notice provisions because it was not receiving necessary documents it had requested from the other party).

▇ In *Allied,* a subcontractor sued the general contractor on various grounds, one of which involved a contract provision that required compliance with notice provisions for authorization of a change in the work to be performed under the contract or for an adjustment of time to perform. *Id.* at 927 n. 5. In order to complete the requests for authorization, the subcontractor, Allied, needed documents from the general contractor, Dick Enterprises; Allied claimed that the documents were not received. The *Allied* court determined that a trier of fact could conclude that defendant Dick Enterprises failed to provide certain documents, thus preventing Allied from providing timely notice. Accordingly, the court held that Allied's failure to comply with the contractual notice provision did not necessarily constitute a waiver of its right to recover under the contract and that the dispute must be resolved at trial. *Id.* at 929–30.

In this case, the Sale Agreement requires Purchaser to notify Seller of its election to seek specific performance within forty-five days "of a Seller's default" and to institute such proceedings within thirty days after the date of Purchaser's notice. Sale Agreement ¶ 17(a)(ii). Defendants and intervenor defendant have identified August 8, 2000 as a date of potential default. This is the date by which the Sale Agreement was to be delivered to Alaska; as discussed *supra,* the Sale Agreement was not actually delivered until August 9, 2000. Plaintiff received notice of the delay by correspondence dated August 15, 2000 (*see* Letter from Barry

Friedman to William F. Martin, Esq. dated August 15, 2000 (Ex. K to Defs.' Mot. for Summ. J.)); the Board did not notify Seller of its intention to bring suit or seek specific performance based on the delay. As a result of plaintiff's failure to notify defendants of their intention to sue or seek specific performance based on this breach, defendants and Alaska argue that plaintiff missed its opportunity to provide notice.

The Court first notes that the Sale Agreement does not require plaintiff to initiate suit on the basis of every possible breach. Accordingly, plaintiff's failure to notify defendants of its intention to seek specific ˙performance as a result of the alleged delay in delivery of the Sale Agreement does not preclude the Board from electing to file suit based on a different breach—the Seller's acceptance of Alaska unmatching offer.

The earliest date the Board could have been aware of the Board's failure to match, the default on which the Board now relies, is August 23, 2000—the date the Board received notice from Heitman that the Sale Agreement was being terminated in favor of Alaska's right of election. In its notice, Heitman included a fax dated August 22, 2000 that it had received from Alaska, which included the following:

> This letter is to provide notice that the Alaska Permanent Fund, acting by and through the Alaska Permanent Fund Corporation ("Alaska"), hereby elects to purchase all Partnership Interests of Telephone Real Estate Equity Trust ("TREET") and Heitman Real Estate Fund II ("HREF") in accordance with and subject to the terms described in Section 4(a) of the Agreement and Consent dated November 17, 1999, among TREET, HREF and Alaska.

Fax from Peter M. Naoroz to Thomas D. McCarthy and Howard J. Edelman (Ex. P–6).

Although plaintiff now argues, after having an opportunity to review the Consent, that one basis for plaintiff's claim of default is that the Consent provided for the purchase of partnership interests, not the property, plaintiff had no way of knowing at that time—prior to receipt of a copy of the Consent—that "Partnership Interests," as defined by the Consent, were not equivalent to the Aramark Tower. Furthermore, although it is undisputed that the Board learned of Heitman's intention to sell the property to Alaska on August 23, 2000 by letter faxed to Girard Estate, the letter stated that the Right of First Refusal party had exercised its Right of First Refusal in accordance with the Sale Agreement, which, if true, would not be "a Seller's default."

In an effort to determine the nature of the right of election referenced in the August 23, 2000 fax, plaintiff sought further information as to whether the Right of First Refusal had been properly exercised. Hearing Tr. at 31–33 (testimony of Richard Burcik, Nov. 30, 2000); *see* Ex. P–6. Despite repeated requests for further documents regarding Alaska's election to purchase partnership interests and whether Seller was in compliance with the terms of the Sale Agreement,[12] the Board was not provided with a full copy of the Agreement and Consent until discovery in this litigation. The Seller's refusal to provide the Board with a copy of the Consent prevented Girard Estate from learning of the alleged breach and complying with the notice provision more quickly.

As a general rule, in a case involving breach of contract, a party's right of action accrues as soon as the other party fails to perform. *See Sun Co., Inc. v. Brown & Root Braun, Inc.*, 2000 WL 1801267, at *3 (E.D.Pa. Dec. 5, 2000) (citing *Selig v. Philadelphia Title Ins. Co.*, 380 Pa. 264, 111 A.2d 147, 151 (1955)). In conjunction with these general rules, many jurisdictions, including Pennsylvania, apply a discovery rule relating to the accrual of breach of contract actions when an injured party is unable, despite the exercise of due diligence, to know of an injury or its cause. *See Pagano v. Flakey Jake's*, 1995 U.S. Dist. LEXIS 16284, at *5–9 (E.D.Pa. Nov. 2, 1995).

The discovery rule is based on the notion that it would be unjust to deprive a party of a cause of action before that party has a reasonable basis for concluding that a viable claim exists. In the words of the California Court of Appeals: "[T]here is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed. And often this is accompanied by the corollary notion that defendants should not be allowed to knowingly profit from their injuree's ignorance." *April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 805, 195 Cal.Rptr. 421 (Cal.App.2 Dist.1983). Although *April Enterprises* concerned a statute of limitations issue, the Court con-

---

**12.** By letter dated August 29, 2000, the Board, through counsel, asked Heitman to provide by September 1, 2000 further documentation, including the portion of the Consent, paragraph 4(a), which created Alaska's right of election. Ex. P–7. By letter sent via facsimile on September 1, 2000, counsel for Heitman declined to provide paragraph 4(a) of the Consent, stating that it is not relevant to the Board's inquiry. Ex. P–8. Subsequently, by faxed letter dated September 25, 2000, counsel for the Board asked for a copy of the Consent in its entirety and advised Alaska that it intended to utilize the equity powers of the courts to enforce specific performance if the Consent was not provided. Ex. P–9. Plaintiff again demanded a copy of the Consent on October 4, 2000. Ex. P–10. Having not received a complete copy of the Consent, the Board again notified Seller on October 9, 2000 of its intention to seek specific performance; it commenced suit the following day, October 10, 2000, in the Philadelphia County Court of Common Pleas.

cludes that this rationale is also applicable to cases where a party has contractually agreed to a limitation on the time within which notice of intention to seek a particular remedy or file suit must be given.

Notwithstanding the Board's repeated attempts to obtain a copy of the relevant provisions of the Consent in order to determine whether or not the Seller defaulted, Heitman refused to provide plaintiff with the information it sought. As a result, the Board was unable to discover the breach on which it now relies until after initiating suit. The Court concludes that there is evidence that the Board exercised due diligence and that Heitman, acting on the partnerships' behalf, caused the delay in the Board's discovery of the claimed breach of contract. Under these circumstances, a trier of fact could conclude that the partnerships cannot now rely on the Board's ignorance of the breach and argue that the Board should have notified them of its intention to seek specific performance, or initiate suit, at an earlier date.

Finally, there is evidence that even if the Board did have notice of Seller's breach prior to commencing this litigation, the Board's notice may have been timely. Notice was provided on Monday October 9, 2000, two days after the deadline if Seller's breach is counted from August 23, 2000. October 7, 2000 was a Saturday and the Sale Agreement expressly provides that "[i]f the time for performance of any obligation [under the Sale Agreement] shall fall on a Saturday, Sunday or holiday . . . such that the obligation hereby can not be performed, the time for performance shall be extended to the next such succeeding day where performance is possible." Sale Agreement ¶ 18.2. Whether performance was possible on October 7, 2000, i.e., whether the Board could have provided notice on that date, is ultimately a question of fact.

## VI. PRELIMINARY INJUNCTION ANALYSIS

 Given the Court's determination that the trier of fact could conclude that the partnerships are bound by the actions and/or representations of their agent, Heitman, that Seller may be estopped from denying Alaska's approval of the Sale Agreement, that the Illinois contract, the Consent, could be validly modified by Alaska's alleged approval or ratification of the Sale Agreement, and that plaintiff's notice of its intention to seek specific performance and suit was timely, the Court concludes that plaintiff has shown a substantial likelihood of success on the merits. Plaintiff has thus satisfied the first requirement for the issuance of a preliminary injunction. Ultimately, the questions of whether Heitman's actions were authorized, whether Alaska is estopped from denying the representations contained in the Sale Agreement, whether Alaska's actions constituted acceptance of the Sale Agreement and whether plaintiff properly notified defendants of its intention to seek specific performance will have to be decided by the trier of fact.

 Regarding the second requirement for the issuance of a preliminary injunction, a denial of injunctive relief could result in substantial harm to plaintiff as defendants would likely proceed with the sale of partnership interests to Alaska if not enjoined from doing so. Plaintiff could thus lose the stake it has in a unique and valuable asset.[13] In contrast, delaying

---

13. *Cf. KP First Ave. v. Prentiss Props. Acquisition Partners*, 2001 WL 438416, at *3 (E.D.Pa. Apr. 26, 2001) (denying preliminary injunctive relief on the ground that plaintiff did not demonstrate irreparable harm where the alleged harm was the loss of an interest in real property). In *KP First Avenue*, plaintiffs, a partnership and the partners to that partner-

the sale will not result in substantial harm to defendants as they will retain a valuable, sought-after asset, and this Court will order plaintiff to post security as required by Rule 65 of the Federal Rules of Civil Procedure.

As a general rule, the amount of security that is appropriate in a given case is left to the discretion of the trial court. *See Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 210 (3d Cir.1990). With respect to the amount of security that will be ordered, counsel for defendants MSI and One Reading requested at oral argument that the Court order a bond in the amount of $80 million dollars, $400,000 per month to compensate defendants for lost interest income, plus a nominal sum for legal fees in the event the Court enjoins the sale of the building to any party. Since defendants will retain control of the property and leasehold, the Court will deny defendants' request for a monthly payment to compensate for interest income. In addition, the Court denies defendants' request for a nominal sum to cover any legal fees as "[a]ttorney's fees are not recoverable as damages in an action on an injunction bond." *Matek v. Murat,* 862 F.2d 720, 734 (9th Cir.1988). *See also Universal City Studios, Inc. v. Corley,* 2000 WL 621120, at \*5 (S.D.N.Y. May 12, 2000) ("[I]t is well established that attorneys' fees are not recoverable as damages in an action on an injunction bond.")

(citing *Matek*); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2954 (West 1995 & Supp.2001) ("The purpose of [Rule 65(c)] is to enable a restrained or enjoined party to secure indemnification for the costs, usually not including attorney's fees, and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect."). However, due to the potential risks inherent in postponing the sale of the building and the possibility that defendants MSI and One Reading will lose a buyer for the Aramark Tower, the Court will order that plaintiff post a bond in the amount of $80 million dollars. This amount is the approximate purchase price of building as contemplated in the Sale Agreement with Girard Estate and would constitute fair compensation for defendants should they suffer damages as a result of being wrongfully enjoined or restrained.

██ Finally, the Court concludes that the issuance of an injunction will be in the public interest. The Court notes that both entities seeking the building—Girard Estate and Alaska—were founded for public purposes. Plaintiff Girard Estate uses the income from its investments to support Girard College, a school and orphanage for needy children. Hearing Tr. at 5 (testimony of Richard Burcik, Nov. 30, 2000). Intervenor defendant Alaska is the "statuto-

---

ship, sought to enjoin the sale of real property arguing that defendants had violated the terms of an agreement between the partners, which afforded plaintiffs a right of first refusal. The court rejected plaintiffs' request for preliminary injunctive relief, concluding that plaintiffs may not have an interest in the real property in dispute. *See id.* at \*3–4. Rather, pursuant to Pennsylvania statutory law, "[t]he interest of a partner in the partnership is his share of the profits and surplus and that interest is personal property." 15 Pa. Cons.Stat. Ann. § 8343.

In this case, the parties are in a different position than the parties in *KP First Avenue.* Plaintiff Girard Estate's interest in the Aramark Tower is created by the Sale Agreement, while defendants' and intervenor defendant's interest in the building is created by virtue of their partnerships and, in Alaska's case, the Consent. Accordingly, the Court concludes that the potential harm to plaintiff in this case is not simply pecuniary, but the potential loss of rights to a unique parcel of real property.

ry corporation that was created to invest primarily [in] oil revenues of the state for the benefit of the current and future Alaskans—generations of Alaskans." Hearing Tr. at 154 (testimony of Peter Naoroz, November 30, 2000). Given the important public purposes of each of these organizations, the Court concludes that the public will best be served by a resolution of the legal issues and factual disputes presented in this case at trial.

■ Accordingly, plaintiff's Motion for Preliminary Injunctive Relief will be granted in part and denied in part. Having determined that there are a number of questions that must be resolved by the trier of fact, the Court concludes that, at this stage in the proceedings, it is appropriate to enjoin the sale of the building to Alaska to preserve the status quo. The record thus far, however, does not warrant the extraordinary equitable remedy of ordering the sale of the building to Girard Estate.

## VII. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for a Preliminary Injunctive Relief will be granted in part and denied in part. An appropriate order follows.

### ORDER

AND NOW, this 8th day of June, 2001, upon consideration of the Motion by Plaintiff City of Philadelphia for Preliminary Injunctive Relief (Document No. 2, filed October 12, 2000), Plaintiff's Supplemental Memorandum of Law in Support of Injunctive Relief and in Opposition to Defendants' and Intervenor Defendant's Motions for Summary Judgment (Document No. 27, filed December 8, 2000), Alaska Permanent Fund Corporation's Post–Hearing Brief (Document No. 25, filed December 8, 2000), and the evidence and arguments presented by the parties on November 30,

2000 and December 12, 2000, **IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunctive Relief is **GRANTED IN PART** and defendants One Reading Center Associates, MSI Associates L.P., and intervenor defendant Alaska Permanent Fund Corporation are hereby **ENJOINED** from executing the sale of partnership interests in MSI and One Reading Partnerships to Alaska Permanent Fund Corporation pursuant to the Agreement and Consent dated November 17, 1999 or any other instrument. In all other respects, plaintiff's Motion for Preliminary Injunctive Relief is **DENIED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, plaintiff shall **POST A BOND** in the amount of $80 million dollars as security within four days from the date of this Order for the payment of costs and damages that may be incurred by defendants if they are found to have been wrongfully enjoined. If additional time is required for the posting of such a bond, plaintiff shall request such additional time in writing within four days. This Order shall not take effect until the bond is posted.

**IT IS FURTHER ORDERED** that the Court's Order, dated October 13, 2000, in which settlement of the purchase of the building was ordered postponed until the Court's decision on the Motion for Preliminary Injunctive Relief, shall remain in effect for four days or such extension of that date as is approved by the Court.